**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ABDELFATTAH NIMER, | ) | CASE NO.: |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| | ) | |
| -vs- | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| CASE WESTERN RESERVE | ) | **PLAINTIFF'S MOTION FOR** |
| UNIVERSITY, | ) | **TEMPORARY RESTRAINING** |
| | ) | **ORDER AND PRELIMINARY** |
| Defendant. | ) | **INJUNCTION** |
| | ) | |

## I.      INTRODUCTION

In this action, Plaintiff, Abdelfattah "Abood" Nimer, challenges whether Defendant, Case Western Reserve University, is permitted to apply one set of academic standards for its male students and a different set for its female students.  Only such a double standard, which clearly violates Title IX, would justify the university's decision to retain two female students with academic performances that were exceedingly similar to his, while simultaneously dismissing him from the program.  Abood seeks to be treated the same as these female counterparts, who were given an opportunity to improve their academic performances and remain on track to graduate.  He believes that he can succeed in this goal, as he has only just begun to get recover from his recently-diagnosed (and even-more-recently treated) medical conditions.

While the relief sought herein by Abood is eminently reasonable, the same cannot be said about the behavior of CWRU.  In December 2017, CWRU told Abood he may have to repeat the academic year if he failed a course in the Spring 2018 semester.  Six months later, after the Spring 2018 semester concluded, CWRU reversed course and dismissed Abood from the program entirely.  It then sustained that decision in an internal appeal while reinstating two

female students with exceedingly similar academic records.  As justification, CWRU not claims that there were material differences between Abood's performance in the appeal as compared to those female comparators.  Of course, CWRU has also deleted the recording of Abood's appeal hearing, so we cannot definitively determine what was said.

Unless this Court intervenes and issues Abood a temporary restraining order now, he will be at substantial risk of falling behind his classmates, who began their semester approximately two months ago while CWRU investigated Abood's situation.  As explained herein, Abood is entitled to such an order.

## II.     STATEMENT OF FACTS

### A.     Abood Begins His Studies at CWRU

Abood, a 2012 graduate of the University of South Florida, earned admission to CWRU's dual-degree, five-year Doctor of Dental Medicine and Master of Public Health program (the "DMD-MPH program") in 2015.  This was the latest step in an otherwise fruitful academic career that, until recently, had been able to succeed despite Abood enduring occasionally severe symptoms of attention deficit hyperactivity disorder ("ADHD") and depression.  Until recently, Abood's ADHD and depression had gone undiagnosed, but he had nevertheless been able to progress in his academics despite the symptoms of his conditions.

Abood's first year in the DMD-MPH program is an excellent example.  The 2015-2016 academic year, pursuant to DMD-MPH program protocol, was entirely focused on Master of Public Health ("MPH") courses.  The MPH program is challenging and is comprised of 32 credit hours at the graduate level.  Though his ADHD and depression affected his ability to perform the same as his classmates, Abood completed that first year with a 3.556 grade point average.

Soon, however, Abood's medical disabilities would be simply too challenging to overcome without help.  Abood's next four years of the DMD-MPH program were to be spent at CWRU's School of Dental Medicine, which, as one would expect, confronts students with a rigorous academic curriculum.  As he settled into the pace of that curriculum, Abood noticed his ADHD symptoms (difficulty in concentration and organization, fluctuating energy levels, problems prioritizing and completing tasks) affecting his performance.

Concerned, Abood started seeing a therapist during the Fall 2016 semester.  But he did not truly recognize the need for medical intervention until the end of that semester, when (despite passing nine out of his ten classes) he failed his "Dental Anatomy" course.  Profoundly disappointed, Abood attempted to schedule an appointment at CWRU's Health and Counseling Service center ("UH&CS"), but there was such a long wait for appointment times for a learning disability assessment, so Abood figured he would overcome this latest setback like he had his previous ones.  He resolved to simply try to improve his academic performance on his own.

**B.      CWRU's Student Handbook and the Consequences of Academic Failure**

CWRU's School of Dental Medicine maintains a Student Handbook ("Handbook"), a true and accurate copy of which is attached hereto as **Exhibit 1**.  In relevant part, the Handbook states that the Committee on Student Standing and Promotion (the "Committee") may, at its option, "place a student on academic probation, require repetition of an academic course, or require a student to withdraw (dismissal from school)."  (Handbook, p. 18.)  The Handbook further states:

> It is the Committee's responsibility to determine if remediation is appropriate for any individual student who has received a failing grade in a course.  The Committee will review a student's semester record overall and within the context of the academic year.  The Committee determines if a student may proceed with remediation or if another action is appropriate.  This may include requiring repetition of the term, the academic year or requiring withdrawal or

3

dismissal...Students with failures in 2 or more courses would in most cases be required to repeat the term or year, be asked to withdraw or be dismissed unless extenuating circumstances warrant special consideration.

(Id.)  The Committee does not operate completely as a "black box," however.  Instead, the Handbook explicitly promises students that the Committee will "notify each student in writing of their status at least twice each academic year following the end of each semester and more frequently if necessary."  (Id.)

### C.   Abood's Remediation of Course Failures

In fulfilling that notification requirement, the Committee sent Abood a letter, dated December 12, 2016, advising that his academic status was "Probation."  (See, December 12, 2016 letter, attached hereto as **Exhibit 2**.)  It warned that Abood had one semester to improve his academic status to Good Standing.  The letter further instructed Abood on how to remediate the failure in his Dental Anatomy course.

Abood promptly remediated and passed the Dental Anatomy course.  Following the remediation, Abood received a new letter from the Committee, advising that he had improved his academic status to Good Standing.  (See, March 13, 2017 letter, attached hereto as **Exhibit 3**.)  During the remediation, a female student who, for privacy reasons, is referenced herein as "Jane Doe 1" (as well as another female student) was also remediating the same class.

Abood's medical problems, however, continued.  In the Spring 2017 semester, Abood took 23.50 credit hours and passed every class except "Head & Neck Structure & Function."  Based on this failure, Abood was once again placed on Probation by the Committee, with a letter nearly identical to the one issued in December 2016.  And, once again, Abood followed the remediation plan recommended by the Committee, remediated the course failure, and received a new letter revising his academic status to Good Standing once more.  (See, September 21, 2017

4

letter, attached hereto as **Exhibit 4**.)  Sure enough, Jane Doe 1 also remediated the same course.
Thus, Abood knew that at least one other student had failed the exact same courses as him during
the 2016-2017 academic year.

### D.      Abood Seeks Advanced Treatment for His Medical Condition

Following his first year in the dentistry program, Abood realized that simply seeing a
therapist was not effective enough, and that his medical condition needed further treatment.  He
scheduled an appointment with Richard M. Hill, MD, PhD ("Dr. Hill"), who diagnosed Abood
with ADHD and, in August 2017, started Abood on a treatment and medication regimen.

Throughout the Fall 2017 semester, Abood wrestled with his new ADHD medication and
his still-undiagnosed depression.  Consistent with his prior performance, he passed 11 courses
and labs, but unfortunately failed his Endocrine & Reproductive Systems course and his
Prosthodontic Technology (didactic and lab) course.  Abood was passing nearly all his classes,
and had demonstrated an ability to remediate classes without issue – but he was clearly
struggling with the symptoms of his medical condition.

### E.      The Committee Tells Abood that Continued Academic Failure Would Result in Having to Repeat the Second Year

As a result of the Fall 2017 semester failures, the Committee once again sent Abood a
letter regarding his academic status.  (See, December 6, 2017 letter, attached hereto as **Exhibit
5**.)  This Committee's letter, however, was noticeably different than its prior communications.
This time, the Committee (1) placed Abood on academic probation, (2) ordered Abood to
remediate one of his failed courses in the next (Spring 2018) semester, and (3) determined that
Abood would have to repeat the Prosthodontic Technology course entirely.  The letter stated:
"The Committee cautions you that any course failure in the spring 2018 semester will put you at
high risk of **being required to repeat the second year of the curriculum**."  (Emphasis added.)

F.    **The Spring 2018 Semester**

Because having to entirely repeat Prosthodontic Technology put Abood at risk of a delayed graduation, he appealed the Committee's decision pursuant to the Handbook and sought a hearing to plead that he should be permitted to remediate all courses in the Spring 2018 semester.  Eventually, the Committee decided to permit Abood, Jane Doe 1, and another female student who, again for privacy reasons, will be referred to herein as "Jane Doe 2," to remediate the Prosthodontic Technology lab during the Spring 2018 semester, putting off the decision as to whether these students would have to remediate the associated didactic course.  Provided Abood was able to successfully remediate, this would keep him on track to graduate in 2020.

Just as in prior semesters, Abood's remediation efforts were successful.  This time, Abood felt he had turned a corner.  Dr. Hill diagnosed Abood with clinical depression in addition to his ADHD, and the medication issued for the depression was having a profound impact on Abood's ability to perform his work in an organized and timely way.  Abood quickly passed his Endocrine & Reproductive Systems course.  With respect to his Prosthodontic Technology lab course, Abood was graded on two projects and a competency exam.  When he first took and failed the course in the Fall 2017 semester, he scored a 77% on his first project, a 67% on his second project, and a 63% on the competency exam.  However, when he remediated the course in the Spring 2018 semester – with slight accommodations for his conditions – he scored 90%, 84%, and 98%, respectively, on these requirements.

This remediation is all the more impressive given that it occurred during the Spring 2018 semester, while Abood was taking 19 separate classes and clinics.  Abood's patient care in the clinic was impeccable and he demonstrated no weaknesses in performing treatment.

Regrettably, however, earlier in the Spring 2018 semester, and prior to his diagnosis and treatment for depression, Abood had performed poorly on an exam in his "OMF Pathology" course. Sure enough, of the 19 courses and clinics in the Spring 2018 semester, Abood failed only one – OMF Pathology. Nevertheless, his performance had obviously improved as the semester went on. Upon information and belief, Jane Doe 1, Jane Doe 2, and several other students also failed OMF Pathology.

### G.  Abood Is Dismissed from the DMD Program

The Committee had previously represented to Abood what the consequences would be for another failure: repeating the second year of the curriculum. But, on June 1, 2018, the Committee sent Abood a letter advising him that he had been dismissed entirely from the DMD program based on his Spring 2018 semester performance. (See, June 1, 2018 letter attached hereto as **Exhibit 6**.) The letter specifically said: "The Committee has voted to dismiss you from the D.M.D. program of the School of Dental Medicine **due to repeated unsatisfactory academic performance**." (Emphasis added.)

By this time, Abood had made several requests for accommodations based on both his ADHD and his depression. CWRU faculty and staff were well aware that Abood had recently been diagnosed with serious conditions, and that he was in the process of treating them. Nevertheless, the June 1, 2018 letter reprimanded Abood for his academic performance in prior academic years, without any recognition of the way in which Abood's medical condition had affected that performance.

Given that Abood had seen them remediating courses the same as him, he was not surprised when both Jane Doe 1 and Jane Doe 2 told him that they too had been removed from the DMD program based on their academic performances. Abood knew that there were no

7

significant differences in his academic record as compared to theirs.  All three students appealed the Committee's decisions and sought reinstatement.

In Abood's appeal letter, he explained that he had suffered from ongoing ADHD and depression, and that his failure in OMF Pathology was a result of the "score on the first exam in the OMFP course," prior to effectively treating his depression, which "was not something I could recover from" in that semester.  (See, June 15, 2018 letter, attached hereto as **Exhibit 7**.)  But, Abood wrote, "[a]fter beginning treatment [for depression], I was able to attend all lectures and my scores improved as a result."  Abood concluded his appeal letter by promising to meet with the Committee and discuss what he could do differently, and also explain his medical condition in a private setting if the Committee was interested.  On June 25, 2018, Abood attended a Committee hearing and was asked about his medication and whether he had suffered symptoms of his conditions earlier in his life.  Later that day, Dr. Kristen Williams, Associate Dean for Admissions and Student Affairs, emailed Abood and advised him that his appeal had been denied and that his removal had been upheld.  (See, email correspondence, attached hereto as **Exhibit 8**.)

### H.     Abood Earnestly Implores CWRU to Reconsider Its Decision

In the following weeks, Abood corresponded and met with CWRU staff to implore whether anything could be done.  As time went by, however, he also learned that both Jane Doe 1 and Jane Doe 2, each of whom had remarkably similar academic records, had been reinstated to the DMD Program because the Committee had sustained both of their appeals.

Abood figured that surely there had to be a mistake.  Given the similarity in academic performance between him, Jane Doe 1, and Jane Doe 2, and out of concern that the Fall semester of the third year of the DMD program would begin on August 6, 2018, Abood initiated an

investigation with the university's Office for Inclusion, Diversity and Equal Opportunity ("OIDEO") via a July 30, 2018 letter.

A CWRU representative assured Abood that the university would take any appropriate measures to ensure that Abood would not be prejudiced by the delay caused by the investigation. (See, July 31, 2018 correspondence, attached hereto as **Exhibit 9**.) OIDEO investigator Donna Davis-Reddix ("Davis-Reddix") interviewed Abood on August 6, 2018.

Abood has since learned that the OIDEO does not move quickly. For example, Davis-Reddix took nearly two weeks to assemble a written summary of Abood's 20-minute interview. On August 19, 2018, Davis-Reddix sent the summary to Abood for his review. Abood reviewed it with horror. The summary was rife with mischaracterizations and fabrications, and had materially distorted what had been stated in his interview. More specifically, Davis-Reddix had attempted to portray Abood's behavior in his Committee appeal hearing as showing a lack of willingness to improve his performance and closed-mindedness on ways to improve.

In response to Davis-Reddix's dubious interview summary, and in an effort to get to the truth of what actually happened, counsel for Abood sent an August 24, 2018 letter pointing out that CWRU had an audio recording that had been created of Abood's appeal hearing, thus there was no need to create questionable written summaries of that hearing. Six days later, Davis-Reddix wrote back that the audio recording had been destroyed. (See, August 30, 2018 email correspondence, attached hereto as **Exhibit 10**.)

## I.     **The OIDEO Upholds the Committee's Discriminatory Decision**

On September 24, 2018, the OIDEO issued an investigatory report, justifying CWRU's decision to exclude Abood from the DMD program by writing: "the Committee asked you for a plan on how you could academically succeed going forward, and was not satisfied with your

answer." Thus, CWRU now seeks to justify its decision by what was said at the Committee hearing, even though it deleted the contents of the recording.

## III.    LAW AND ARGUMENT

In the absence of a temporary restraining order, Abood will be denied participation in the CWRU DMD program in the Fall 2018 semester, greatly jeopardizing his ability to timely graduate. He thus faces imminent risk of harm.

To obtain a TRO, Abood must establish that:

(1) he has a strong likelihood of success on the merits;

(2) he will suffer irreparable harm if injunctive relief is not granted;

(3) granting the injunctive relief will not cause substantial harm to defendants;

(4) the public interest is best served by granting injunctive relief.

*Certified Restoration Dry Cleaning Network v. Tenke Corp.,* 511 F.3d 535, 542 (6th Cir. 2007). These four considerations are to be balanced; they are not prerequisites that must be met by the moving party. *Id.* As established by the Verified Complaint, and the law and evidence contained herein, it is clear that Abood will suffer irreparable injury unless he obtains injunctive relief.

### A.    Plaintiff Has a Strong Likelihood of Success on the Merits

A moving party is not required to prove his case in full at a preliminary injunction hearing. Instead, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. *Id.*

#### 1.    Title IX

Title IX is a federal statute designed to prevent sex discrimination in educational institutions receiving federal funding, providing that "no person in the United States shall, on the

basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). In *Doe v. Cummins,* 662 Fed. Appx. 437 (2016), the Sixth Circuit identified "two categories of Title IX claims related to student disciplinary hearings: 'erroneous outcome' claims and 'selective enforcement' claims." *Id.* at 451. While this case does not involve a disciplinary matter, "cases involving student misconduct are analogous to" dismissals for alleged "deficient academic performance" and thus the same analysis can be applied. *Curto v. Smith*, 248 F. Supp. 2d 132, 146 at n. 26 (N.D.N.Y. 2003) (discussing "erroneous outcome" and "selective enforcement" in an academic deficiency setting).

First, under the "selective enforcement" theory, Title IX is violated if "a female was in circumstances sufficiently similar to" Abood and "was treated more favorably" due to gender by CWRU. *Doe*, 662 Fed Appx. at 452; *Mallory v. Ohio Univ.*, 76 Fed. Appx. 634, 641 (6th Cir. 2003). Stated otherwise, if that "the severity of the penalty…was affected by [Abood's] gender," Title IX is violated. *Doe v. Case Western Reserve Univ.*, N.D. Ohio No. 14CV2044, 2015 U.S. Dist. LEXIS 123680, *10 (Sept. 16, 2015).

In *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172 (10th Cir. 2001), a male nursing student received a "D" in his "Process II" class and, pursuant to the defendant's school policy, was required to withdraw from the nursing program. In support of his Title IX claim, the plaintiff introduced evidence that the school applied its grading and academic failure policies in a sexually discriminatory manner. *Id.* at 1177. More specifically, the plaintiff identified a female student from a different class (Practicum I) who was contacted by her professor near the end of the semester and "informed…that she had not successfully completed the class and would be given a D on her transcript." *Id.* That female student, however, "was

11

given the opportunity to complete seven additional weeks of work in the course," improve her grade, and stay in the program. Such evidence supported the plaintiff's theory that the defendant was taking steps to preserve female students, while dismissing male students. According to the court, this showed that the school "discriminated on the basis of gender in applying its school-wide policy of allowing failing students to receive incomplete grades and extra time to improve their performance." *Id.* at 1178.

In *Gossett*, the court was not concerned that the female comparator had remediated a *different* class with a *different* professor. Even if that had matter mattered, however, there is no such distinction here. Jane Doe 1 and Jane Doe 2 have exceedingly similar grades and took the **same courses** as Abood. Plus, the **same Committee** decided the fate of all three students. While both female students were permitted to continue, only Abood was dismissed. Thus, CWRU selectively enforced its academic standards, holding its male student to a higher standard than its females and thereby violating Title IX.

Alternatively, Abood is also likely to prevail under an "erroneous outcome" theory, which requires a showing of (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the proceeding and (2) a causal connection between the flawed outcome and gender bias. *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018). The Committee's December 6, 2017 letter clearly stated that "any course failure in the spring 2018 semester will put you at high risk of being required to repeat the second year" of the DMD curriculum. Thus, the Committee had already taken a position as to the outcome should Abood fail a course in the Spring 2018 semester. Bizarrely, when a failure did occur, the Committee changed this consequence after-the-fact, and dismissed him from the school. While Abood's gender was not explicitly discussed in the Committee hearing, clearly there is a connection between gender bias

and this flawed outcome. After all, the two similarly situated female students have been permitted to continue and Abood has not.

In addition to the above-referenced legal standards, alternative decisions have analyzed Title IX claims under the familiar burden-shifting framework associated with Title VII and other, employment discrimination claims. Those courts hold that a plaintiff makes out a prima facie case by showing (1) he was a member of a protected class; (2) he was performing the academic requirements at a level sufficient to meet his educator's legitimate expectations; (3) he suffered adverse treatment; and (4) the educational program continued to instruct and credit other students. *Workman v. Univ. of Akron*, N.D. Ohio No. 16-cv-156, 2017 U.S. Dist. LEXIS 203302, *8 (Dec. 11, 2017).

Assuming there is no dispute about factors (1), (3), and (4), the only way that CWRU can seriously challenge Abood's prima facie case under this theory would be to claim that Abood was not meeting the legitimate academic expectations of the university. Of course, the prima facie showing in the context of a Title IX claim is minimal and does not even need to rise to the level of a preponderance of the evidence. *Varlesi v. Wayne State Univ.*, 909 F. Supp.2d 827, 857 (E.D. Mich. 2012). Additionally, when a dismissal is based on academic performance, the "adequate performance inquiry merges with the pretext inquiry" and the Court should review the evidence to ensure that the university's argument regarding academic expectation is not pretextual. *Id.* For example, when an instructor disputes the university's criticism of the student's academic performance, there is a genuine issue about whether that student was meeting legitimate academic expectations. *Id.*

Abood will also be able to show that CWRU's explanation for its conduct is pretextual. First, the Committee itself promised Abood that a different consequence would occur if he

suffered an academic failure in Spring 2018.  That policy deviation was compounded by the fact that the dismissal letter focuses on Abood's academic struggles from earlier semesters, in violation of the Handbook and thus CWRU policy.  Second, the former Director of Student Affairs, Kristin Victoroff, disputes the severity of Abood's academic performance.  Third, similarly situated comparators performed the same academically, and yet were not dismissed. Fourth, the original rationale offered by Defendant was that Abood's dismissal was justified by "repeated unsatisfactory academic performance."  However, in the OIDEO's investigatory report, CWRU justifies his dismissal by stating: "the Committee asked for a plan on how you could academically succeed going forward, and was not satisfied with your answer."  In addition to shifting this explanation, CWRU also conveniently deleted the recording of the hearing, so that this Court cannot listen to it for itself.

Based on the foregoing, Abood is substantially likely to prevail on the merits of his Title IX claim and thus is entitled to a temporary restraining order and preliminary injunction.

## 2.      Retaliation in Violation of the ADA and Rehabilitation Act

In addition to CWRU's violation of Title IX, the university has also run afoul of the protections afforded students under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act.  More specifically, both 42 U.S.C. § 12203 (ADA) and 29 U.S.C. § 794a (Rehabilitation Act) prohibit any retaliation or threat against, or intimidation or coercion of, or interference with, a person engaged in activity protected under those laws.

To establish a prima facie case of unlawful retaliation, Abood must show (1) that he engaged in protected activity, (2) that he suffered an adverse action, and (3) a causal link between the protected activity and the adverse action. *Atchison v. Bd of Regents of the Univ. Sys. of Ga., N.D. Ga.*, No. 13-cv-02922, 2014 U.S. Dist. LEXIS 189249, *19 (Nov. 13, 2014).

Elements one and two are easily met.  There is no question that Abood engaged in protected activity; throughout the 2017-2018 academic year, he made multiple requests for accommodations, both formally and informally, to address his ongoing diagnoses.  Seeking reasonable accommodations is protected activity under the ADA and the Rehabilitation Act.  See, e.g. *Alston v. District of Columbia*, 561 F. Supp.2d 29, 42-43 (D.D.C. 2008).  And obviously Abood suffered an adverse action, since he was dismissed from the school.

There also is evidence of a causal relationship between Abood's protected activity and his dismissal.  In the Fall 2017 semester, as Abood struggled to adjust to his new treatment and medication, he asked Dr. Love, a Committee member, if he could have an accommodation for his ADHD in performing certain classwork.  Dr. Love derisively responded: "You have ADHD – well, so what does that mean?"  Then, during the Spring 2018 semester, and in response to another accommodation request for additional time, Dr. Love asked Abood: "Are you going to charge patients twice as much?"  Clearly, Dr. Love was skeptical about Abood's accommodations for additional time, eventually telling Abood: "I've seen a lot of people in this situation before.  They have a really hard time in the clinic and they can't make things work.  I'm worried about whether you're going to have enough time.  Are you going to need a lot of help?  This is the point where you need to ask yourself – is this what you want to do?"

Dr. Love – who was harshly critical of Abood's academic performance in the appeal hearing – clearly bore an animus against Abood's need for accommodations to address his ongoing diagnoses.  This animus influenced the Committee's decision and caused CWRU to dismiss Abood instead of retaining him like other, similarly situated students.[1]

---

[1] It bears keeping in mind that Abood had not been diagnosed with either condition under August 2017 – less than a year ago.  Frankly, it is remarkable that he was able to progress this far in his academic career without accommodations.

As explained above, there is ample evidence that the Committee's shifting justifications for its actions are pretextual. Thus, Abood is substantially likely to prevail on his retaliation claims under the ADA and the Rehabilitation Act.

### 3. Breach of Contract / Promissory Estoppel

Plaintiff also is likely to prevail on his breach of contract claim. As explained by the district court in *ASI Business Solutions, Inc. v. Otsuka Am. Pharmaceutical, Inc.*, 233 F. Supp. 3d 432 (E.D.Pa. 2017):

> Under certain circumstances, a preliminary injunction may be appropriate in a case involving a claim for breach of contract. See, e.g., *Chicago Title Ins. Co. v. Lexington & Concord Search and Abstract, LLC*, 513 F. Supp. 2d 304, 313-14 (E.D. Pa. 2007) (granting motion for preliminary injunction based in part on [**11] claim for breach of contract); *Darius Int'l, Inc. v. Young*, No. 05-6184, 2006 U.S. Dist. LEXIS 22389, 2006 WL 1071655, at *20-21 (E.D. Pa. Apr. 20, 2006) (granting motion for preliminary injunction on claims for breach of contract and unfair competition). "When a preliminary injunction is sought based on a breach of contract, irreparable injury may be found in two situations":
>
> (1) where the subject matter of the contract is of such a special nature [or] of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable. *Home Line Furniture Indus., Inc. v. Banner Retail Mktg., LLC*, 630 F. Supp. 2d 527, 540 (E.D. Pa. 2009) (quoting *ECRI*, 809 F.2d at 226).

The law in Ohio is clear that such a contract exists between CWRU and Abood. As stated in *Savoy v. Univ. of Akron*, 2014-Ohio-3043, 15 N.E.3d 430 (10th App. Dist., 2014):

> When a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature. *Prince v. Kent State Univ.*, 10th Dist. No. 11AP-493, 2012-Ohio-1016, ¶ 30; *Behrend v. State*, 55 Ohio App.2d 135, 379 N.E.2d 617 (10th Dist.1977), paragraph two of the syllabus. The terms of such a contract are found in the college or university catalog, handbook,

16

and/or other guidelines supplied to the students. *Prince*, citing *Tate v. Owens State Community College*, 10th Dist. No. 10AP-1201, 2011-Ohio-3452, ¶ 21; *Lewis v. Cleveland State Univ.*, 10th Dist. No. 10AP-606, 2011-Ohio-1192, ¶ 14.

To be sure, courts generally try to avoid interfering with private university contracts in the absence of an arbitrary act or "abuse of discretion." *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 713 (S.D. Ohio 2015); *Faparusi v. Case W. Reserve Univ.*, 711 Fed. Appx. 269, 277 (6th Cir. 2017). And the Handbook acknowledges that discretion, stating that the Committee may, at its option, "place a student on academic probation, require repetition of an academic course, or require a student to withdraw (dismissal from school)." Thus, Abood does not deny that the Committee has some discretion in determining how to address academic failure. That discretion affords the Committee a range of options: (1) remediation, (2) repetition of the term, (3) repetition of the academic year, (4) requiring withdrawal or dismissal.

But that discretion is not totally unfettered. After all, if Jane Doe 1 and Jane Doe 2 are permitted to continue their studies unimpeded, how would Abood's continued participation jeopardize CWRU's educational or doctrinal responsibilities? Thus, there is no justification for this differential treatment. An abuse of discretion occurs when a decision is "unreasonable, arbitrary, or unconscionable." *Christ v. Konski*, 181 Ohio App.3d 682, 2009-Ohio-1460, 910 N.E.2d 520 (6th Dist.), ¶15. Here, Abood does not question whether a university should be permitted to dismiss a student in some circumstances – provided the consequences are applied **fairly** and **even-handedly**. However, an abuse of discretion does occur when two (or more)

students have exceedingly similar course failures, and some (female) students are permitted to continue while one (male) student is not, without any significant differentiating characteristics.[2]

Plus, a private university's process must be conducted with "notions of basic fairness." *Pierre*, 143 F. Supp. 3d at 713.  Here, the Handbook explicitly promises students that the Committee will "notify each student in writing of their status at least twice each academic year following the end of each semester and more frequently if necessary." (Handbook, p. 18.)

There is no question that the Committee provided such notification in Abood's case.  On December 6, 2017, the Committee told Abood that "any course failure in the spring 2018 semester will put you at high risk of **being required to repeat the second year of the curriculum**." (Emphasis added.)  But implicit in the Handbook's promise regarding the Committee's notification of status is that the Committee will actually adhere to the representations it provides the students.  Abood failed one class in the Spring 2018 semester,[3] and the Committee abruptly reversed course and summarily dismissed him from the program. This is a clear breach of the notification commitment under the Handbook, an arbitrary about-face from the Committee's prior representations, and an abuse of the Committee's discretion.

Not only is Abood likely to prevail on his breach of contract claim, he also will prevail on his claim of promissory estoppel.  That claim requires (1) a clear and unambiguous promise; (2) reliance upon the promise by the person to whom the promise is made; (3) the reliance is reasonable and forseeable; and (4) the person claiming reliance was injured as a result of the

---

[2] Additionally, the Committee appears to have completely disregarded the Handbook's directive that, in determining the consequences of a failing grade, the Committee "will review a student's **semester record overall** and **within the context of the academic year**." (Handbook, p. 18.) (Emphasis added.)  Here, the Committee's dismissal letter referenced prior, remediated probationary periods from earlier academic years.

[3] Due to the scheduling of clinical work on Friday afternoons, at the same time that Abood has a weekly religious observance, Abood had also one additional patient to treat for a clinical requirement.

reliance on the promise. *Doe v. Case Western Reserve Univ.*, N.D. Ohio 17 CV 414, 2017 U.S. Dist. LEXIS 142002, *37 (Sept. 1, 2017). The Handbook promised Abood that he would be advised of his academic status by the Committee. He relied on that representation, and the subsequent representation by the Committee that a course failure would result in repetition of the year, not dismissal. Thus, Abood is likely to prevail on both his breach of contract and promissory estoppel claims.

### B. <u>Plaintiff Will Suffer Irreparable Harm Absent Injunctive Relief</u>

The Fall 2018 semester of the third year of Abood's DMD curriculum has been underway for approximately two months. While CWRU previously represented that Abood could be reinstated without interruption during the pendency of the OIDEO investigation, that investigation concluded a week ago, and thus the university is no longer committed to restoring Abood and/or working with him to ensure that his academic progress is uninterrupted.

Thus, Abood is **<u>currently</u>** able to be reinstated now without substantial interruption, but that moment is fleeting. If he misses additional time, he will be at significant risk of being unprepared for the next round of examinations, or will be precluded altogether from taking those examinations. Missing the entirety of the Fall 2018 semester would result in Abood essentially being unable to take the Spring 2019 semester, thereby jeopardizing Abood's ability to graduate in a timely manner and proceed with his career. Thus, Abood needs to be reinstated **<u>now</u>** if he has any hope of maintaining his academic progress.

### C. <u>Injunctive Relief Will Not Cause Substantial Harm To Defendant</u>

An order requiring CWRU to reinstate Abood active status will not harm CWRU in the least. Abood has passed nearly all of his classes and has been exemplary in his clinic work. For the classes he failed, he has always been able to remediate them without issue. Indeed, he is

currently taking a course on CWRU's campus related to his Master in Public Health degree. Simply put, if Jane Doe 1 and Jane Doe 2 are permitted to continue, then there is no risk to CWRU if Abood would also be permitted. Thus, Defendant would not be harmed by permitting Abood to study in this semester.

### D. <u>The Public Interest is Best Served by Granting Injunctive Relief</u>

The public interest would be furthered by an order of injunctive relief since there is legitimate cause for concern when an educational institution adopts one set of academic standards for men and a different one for women. That concern is compounded when a fundamental institution of the community like CWRU shows disdain and disregard for a student's medical struggles and disabilities and, after assuring that student that academic failure would not result in dismissal, dismisses him nonetheless in contravention of prior representations.

## IV. <u>CONCLUSION</u>

Abood has met the criteria for injunctive relief and is at imminent risk of irreparable harm. For all of the above reasons, he asks this Court to grant his motion for temporary restraining order and preliminary injunction (i) requiring CWRU to reinstate Plaintiff to the DMD Program, Class of 2020, and (ii) requiring CWRU to take all reasonable, appropriate, and necessary measures to ensure that Plaintiff is adequately positioned within his classes and coursework and not prejudiced by the delay in time associated with OIDEO's investigation. A certification of notification is being filed herewith.

Respectfully submitted,


*/s/ John E. Moran*_____
John E. Moran  (#0087272)
*jem@mccarthylebit.com*
McCARTHY, LEBIT, CRYSTAL
 & LIFFMAN CO., L.P.A.
101 West Prospect Avenue
1800 Midland Building
Cleveland, Ohio  44115
(216) 696-1422 (telephone)
(216) 696-1210 (facsimile)

Attorney for Plaintiff